## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

RICKY STEPHENS,

     **Plaintiff,**

v.

                                             **CIVIL ACTION NO. 05-563-KD-C**

CITY OF BUTLER, ALABAMA, et al.,

     **Defendants.**

### ORDER

Before the court are Motions for Summary Judgment (docs. 90, 95) filed by defendants Lovette and the Town of Butler, Alabama, and by defendant Jackson, respectively.[1]  A hearing was held on the motions on June 14, 2007.

## I.  Procedural History

The court has previously granted in part defendants' Motion to Dismiss. (Doc. 58).  In that order, the court denied defendant Jackson's Motion to Dismiss, brought on the grounds of qualified immunity and granted defendant Lolley's Motion to Dismiss on qualified immunity.  In the course of that analysis, the court held that the Fourteenth, rather than the Fourth, Amendment applied to the plaintiff's excessive force claims.

Plaintiff's remaining claims include: Counts I and VIII-  Excessive force against Officer

---

[1]  In addition, defendant Jackson has filed a Motion to Strike (doc. 111) certain exhibits plaintiff submitted with his Response to the Motion for Summary Judgment.

The court finds it unnecessary to reach the issues presented in by the Motion to Strike. Defendant Jackson asserts that plaintiff's expert is unqualified and thus that his affidavit and deposition should be stricken.  He also argues that a purported M-26 Taser Owners Manual is inadmissible as hearsay and for lack of authentication.  As the court finds neither of these exhibits to be necessary to its review of the summary judgment motion brought by Jackson, the Motion to Strike those exhibits from plaintiff's summary judgment submission is moot.

Lovette and Deputy Jackson under the Fourth and Fourteenth Amendments; Count II - Unconstitutional policy and practice by the Town of Butler; Count III - Failure to properly train and supervise Office Lovette and its other officers by the Town of Butler; Count VI - Assault and Battery against Officer Lovette and Town of Butler; and Count VII- Negligent and Wanton Supervision, Hiring and Retention by the Town of Butler.

## II.  **Facts**[2]

On September 29, 2004, plaintiff Ricky Stephens drove to talk to his stepfather, John L. Stephens, who had accused him of stealing money.  (Stephens Depo. at 26-27.)  Plaintiff had consumed a significant amount of alcohol prior to going to his stepfather's apartment and was inebriated.[3]

Plaintiff drove to the Sherwood Apartments and, at some point thereafter, parked his car in an adjoining parking lot.  Defendant Henry Lovette, a police officer with the Town of Butler, was dispatched to the scene because witnesses had reported that plaintiff was attempting to run over senior citizens and handicapped people with an automobile. (Lovette depo at 19-20.) When Officer Lovette arrived, plaintiff was walking through the parking lot, headed towards his car.  (Lovette depo. at 23, Stephens depo. at 31, 33.)  Lovette noted that there were no people in the immediate vicinity, but he saw some people at a distance of seventy-five to one hundred feet away.  (Lovette

---

[2]  The court, in considering a motion for summary judgment, construes the facts in the light most favorable to the nonmovant.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case."*Priester v. City of Riviera Beach,* 208 F.3d 919, 925 n. 3 (11th Cir.2000).

[3]  Plaintiff admits to having been drinking and to feeling "toasted." (Stephens Deposition at 36)

depo. at 22-26.)

Officer Lovette approached plaintiff and asked him where he was going. Plaintiff responded that he was going home. (Stephens depo. at 39-40.) Lovette said "No. Get in my car. Then I will let you go home." (*Id.*) Lovette approached plaintiff and told him that "he was going to have to go with me, and I explained the report I had." (Lovette depo. at 22-26.) Plaintiff denied that he had tried to run over people; Lovette stated that he was going to have to come with him to the jail. (*Id.*) Plaintiff refused again, and Lovette touched plaintiff's arm and said "Let's don't make this no harder than we have to." (*Id.*)

The back door of the police car was open and plaintiff got in. (*Id.*) Plaintiff was not handcuffed (Lovette depo. at 25); Lovette testified in his deposition that he wanted to get plaintiff away from the other people at the apartment complex. (*Id.* at 125-26.) Officer Lovette testified in his deposition that, at the apartment complex, he  merely intended to detain plaintiff and did not place him under arrest at that time. (*Id.*) Lovette did not search the plaintiff and did not remove plaintiff's keys or other belongings. (*Id.*at 32, 125-26.)

Deputy Carl Jackson drove up to Lovette's car just before plaintiff got into the car. (Jackson deposition at 19-21.) Jackson thought he saw a set of keys in plaintiff's hand as plaintiff got into the rear of Lovette's vehicle. (*Id.* at 21.) Lovette asked Jackson to follow his car to the jail. (Lovette deposition at 28-29.) In the car on the way to the jail, Lovette told plaintiff that "We are going to jail, and we may be able to work this thing out." (*Id.*) Plaintiff asked what he had done and Lovette did not answer. (Stephens deposition at 43-45.) Plaintiff states that he was not profane toward Lovette before or during the ride. (*Id.*)

Once they got to the jail, plaintiff and Lovette got out of the police car and went to the docket

room.  (Lovette deposition at 32-33.)  Deputy Jackson arrived at about the same time and walked

with them.  (Jackson deposition at 25-26.)  Plaintiff walked on his own to the jail.  (Lovette

deposition at 33.)  They proceeded to the docketing/booking room where the jailer, Danny

"Preacher" Wallace, was sitting at his desk.  (Stephens deposition at 43-45.)   That room is

rectangular, approximately ten or twelve feet on a side, (Lovette deposition at 33-34), and contains

a desk with a bank of monitors and a raised counter, and other equipment.  (Jackson deposition at

31; Wallace deposition at 10.)  All three officers were in the room with plaintiff.[4]  (Wallace

deposition at 14.)  Plaintiff remained standing on the doorward side of the counter.  (Stephens

deposition at 52, Wallace deposition at 23-24.)  Plaintiff continued to ask Lovette what he was

charged with.  (Stephens deposition at 43-44, 50-51.)  No one answered him.  (*Id.* at 47-49.)

Defendant Lovette testified that, after they had been in the docketing room for some time,

Lovette informed plaintiff that he was under arrest and told him to put on the jail uniform.[5]  The

---

[4]  Jackson stood in the doorway until plaintiff got too loud, at which point he entered and closed the door. (Jackson deposition at 31.)  According to the jailer, a trustee also came into the room at his signal to bring prison clothes and other supplies for plaintiff.  (Wallace deposition at 14-15.)  The trustee was called after plaintiff was booked and may have been there during the altercation.  (*Id.*)

[5]

Q: ... What happens after you walk inside [into the docket room]?
A: He became real irate and started saying he was not going to jail and using profanity.
...
Q: And did you say anything to him in return?
A: Yes, sir.  I placed him under arrest and told him he was going to have to put his uniform on.
Q: Tell me what you do when you place somebody under arrest.
A: I advise them that they are under arrest.
Q: Why did you not arrest him at the scene?
A: I was not sure I was going to have to arrest him.  I was hoping that we could get the thing where maybe, you know, there was a possibility he wouldn't be arrested.

arrest report contains three charges: Assault–Second Degree, Resisting Arrest, and Disorderly Conduct.  (Doc. 92, exh. 8.)  Lovette testified that it was his understanding that he could not arrest plaintiff for the alleged acts at the apartment complex because he did not see the offense.  (Lovette deposition at 36-37.)  He further stated that the conduct for which he charged plaintiff involved the actions in "the car and in the docket room." (*Id.* at 37.)

At the Choctaw County Jail, the arresting officer is responsible for the bulk of the booking procedure.  (Wallace deposition at 15-16.)  The jailer has little responsibility for this part of the process.[6]  (*Id.*)  The booking procedure consists primarily of filling out a form with identifying information such as name, address, and a physical description.  (*Id.* at 16-17.)  The jailer did not speak to plaintiff during the booking procedure.  (*Id.* at 18.)  The computer wasn't working that day so they did not fingerprint plaintiff.  (*Id.*)  The jailer ordinarily would have handled the fingerprinting.  (*Id.*)  Lovette also copied the plaintiff's identifying information into "the big book"

---

...
Q: ... [D]id you understand that you had the authority to arrest him for any type of anything at that point?
A: No, sir, I didn't.  I didn't arrest him. ... No sir, I did not have the right to do that.  If I didn't see him do it, I did not have the right to do that, based on a citizen complaint.
...
Q: What did you place him under arrest for when he was in the jail?
A: Disorderly conduct.
Q: And that was the conduct that was taking place at the time, or was that the conduct that took place in the car or what?
A: The car and in the docket room, when he started up again in the docket room.
Lovette deposition at 35-37.

[6]
Q: When a detainee or prisoner comes in what is your job responsibility?
A: Basically just sit there with the officer ... and make sure everything is going out that – I can't make him act right but I'm there with him.
Wallace deposition at 15.  Additionally, when the booking is done, the jailer rings for a trustee to bring the jail uniform and other supplies.  *Id.*

at the back of the booking room.  (*Id.* at 23.)  Plaintiff stayed standing at the counter while Lovette did so.  (*Id.* at 24.)  When Lovette finished writing down the information about plaintiff, the next step was to try to get plaintiff to put on a jail uniform.  (*Id.* at 18, 24.)  Lovette asked Wallace whether he was ready for the plaintiff, which Wallace took to mean ready to have plaintiff get dressed in the uniform.  (*Id.* at 24.)

Plaintiff had been acting in an unruly and uncooperative manner while at the jail. (*Id.* at 21; Jackson deposition at 31-35.)  He kept questioning why he was there, what he had allegedly done, and expressing his refusal to go to jail.  (Wallace deposition at 24.)  The jailer told plaintiff to put on the prison clothes and plaintiff refused.  (Wallace deposition at 26-27.)  Lovette then asked plaintiff approximately three times to put on the clothes, but plaintiff refused each time.  (*Id.*)  Plaintiff became agitated during this dispute but did not make any aggressive moves toward any law enforcement officer.  (Jackson deposition at 31-35.)  Plaintiff was unarmed.[7]  (Stephens deposition at 58.)

After Lovette asked a third time, plaintiff said that he was no longer going to listen to Lovette.  (Jackson deposition at 33-34.)  Officer Lovette then said "I can't wait no damned more" and pulled out his taser.  (Stephens deposition at 56-57.)  Lovette then pushed the taser against plaintiff's chest and pulled the trigger.  (*Id* at 60-63.)  Lovette's taser made a repeated irregular popping sound.  Plaintiff was backed into a corner by the filing cabinet and his right arm was pinned.  (Stephens deposition at 62.)  Plaintiff repeatedly tried to push the taser away with his free hand.  (*Id.* at 62-64.)  Lovette pushed the taser against plaintiff's chest again and then against his

---

[7] Defendants assert that Lovette saw a metal object in plaintiff's hand which turned out to be plaintiff's keys, but plaintiff states that the keys and his other personal effect remained in his pockets at all times.

side, where he held it.  (*Id.* at 64.)  He fired it again against plaintiff's side.  (*Id.*)  Lovette also told

Deputy Jackson to shoot plaintiff in the leg with his taser.  (*Id* at 63-64.)  Jackson hit plaintiff with

his taser once in the leg after Lovette had fired at least three or four times.  (*Id.*, at 64.)  At one point,

Wallace told Lovette "that was enough," but Lovette responded "that ain't enough until I say so."

(Stephens deposition at 72, 94-95.)  The officers stopped on their own.  (*Id.* at 66.)  Lovette's taser

includes a readout that indicated that he had pulled the trigger four times.  (Lovette deposition at 46-

47).

Plaintiff was then made to empty his pockets.  (Stephens deposition at 71.)  Plaintiff was

given his jail clothes and supplies and taken to a cell; he did not change into the jail uniform until

after he was in the cell.  (*Id.* at 68.)  He was allowed to keep his own shirt.  (*Id.* at 72.)  A trustee

came and retrieved his pants.  (*Id.* at 71.)  Lovette subsequently filled out an arrest record sheet (see

doc. 92, exh. 8) which included three charges: Assault, second degree; disorderly conduct; and

resisting arrest.  (*Id.*)  The latter two charges arose from plaintiff's actions in the police car and at

the jail.  (Lovette deposition at 46-47.)

Plaintiff sought medical attention in the jail but received no care.  (Stephens deposition at

76-78.)  After plaintiff's release from the jail, his wife took him immediately to Rush Hospital in

Meridian, Mississippi, where the doctor took photographs of numerous second degree burn marks

on plaintiff's body.  (*Id.* at 78-80.)  The marks were in pairs, with a set of marks on his leg that

might have had four prongs.  (*Id.*)  They treated plaintiff and released him with antibiotics and pain

medication.  (*Id.* at 78-82.)

Jailer Wallace was personally aware of other instances in which inmates refused to put on

the jail uniform.  (Wallace deposition at 24-25.)  On two prior occasions, Wallace had been left by

the arresting officers to deal with the arrestee alone and, when they refused, Wallace had allowed

the arrestees to go to their cells in their street clothes.  (*Id* at 27.)  He testified that, if Lovette and

Jackson had not been present, that is how he would have handled Stephens.  (*Id.*)

## III.  Applicable Law and Analysis

### A. Summary Judgement Standard

Summary judgment should be granted only if "there is no issue as to any material fact and

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[8]  The party

seeking summary judgment bears "the initial burden to show the district court, by reference to

materials on file, that there are no genuine issues of material fact that should be decided at trial."

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The  party seeking summary

judgment always bears the "initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the nonmoving party fails to make "a sufficient showing on an essential element of her

case with respect to which she has the burden of proof," the moving party is entitled to summary

judgment.  *Celotex*, 477 U.S. at  317.  "In reviewing whether the nonmoving party has met its

burden, the court must stop short of weighing the evidence and making credibility determination of

---

[8]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:
> [I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992)(internal citations and quotations omitted), *cert denied*, 507 U.S. 911 (1993) . Thus, the court's role at the summary judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  The mere existence of any factual dispute, however, will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004), *cert denied*, 534 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

## B.  Section 1983

Plaintiff alleges constitutional violations against the defendants pursuant to 42 U.S.C. § 1983 ("Section 1983"). Actions brought in federal court to address and remedy a violation of the Constitution by a state actor are enabled through Section 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.   In order "[t]o sustain a cause of action based on section 1983, [a plaintiff] must establish two elements: (1) that [he] suffered a deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States, and (2) that the act or omission causing the deprivation was committed by a person acting under color of law." *Wideman v. Shallowford*

9

*Community Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir.1987) (internal quotations and citation omitted).

"To state a Section 1983 claim the plaintiff must establish that the conduct complained of was committed by a person acting under color of state law and that this conduct deprived the plaintiff of a federal constitutional or statutory right." *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S.Ct. 2689,  61 L.Ed.2d 433 (1979).  However, "[s]ection 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994)(quoting *Baker v. McCollan*, 443 U.S. at 144).  Thus, the first step in analyzing any such claim is to identify the specific constitutional right allegedly violated by the defendant.  *Albright v. Oliver*, 510 U.S. at 271.  Once the particular constitutional right is determined, the court must then apply the standard applicable to that particular constitutional provision to determine whether a constitutional violation has actually occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  In addition, plaintiff must establish a causal connection between the defendant's actions, customs, policies, or statutorily imposed duties and the alleged deprivation of plaintiff's constitutional right in order to state a claim upon which relief may be granted. *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986); *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir.), *cert. den.*, 464 U.S. 932 (1983).

### C.  Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1992)). To be entitled to qualified

immunity, an individual defendant must first show that he was a public official acting within his discretionary authority when the allegedly wrongful acts occurred. *Wood v. Kesler,* 323 F.3d 872, 877 (11th Cir. 2003).

Next in the qualified immunity analysis, the court must consider whether a constitutional violation occurred. *Hope v. Pelzer*, 536 U.S. 73 (2002)("The threshold inquiry a court must undertake in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." ); *Saucier v. Katz,* 533 U.S. 194 (2001). If the court determines, looking at the facts in the light most favorable to the plaintiff, that a constitutional right would have been violated, the second step is to ask whether that particular right was clearly established at the time. *Saucier,* 533 U.S. at 201. An officer is entitled to qualified immunity on an excessive force claim unless every reasonable officer would conclude the force was unlawful. *Slicker v. Jackson*, 215 F.3d 1225, 1232 (11th Cir. 2005).

Defendants Lovette and Jackson have demonstrated that they were public officials at the time of the incident at issue.  Plaintiff has not challenged Jackson's assertion that he was acting within his discretionary authority as backup to Lovette.  Plaintiff does, however, challenge Lovette's entitlement to raise qualified immunity.   Plaintiff argues that Officer Lovette had no authority to arrest or detain him at the apartment complex.  As part of this theory, plaintiff asserts that he was not guilty of assault against his father-in-law.  The discretionary authority determination is not as narrow as plaintiff's argument would have it.  Defendant need only show that the acts he undertook "are of a type that fell within the employee's job responsibilities." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th 2004) (claims included unlawful arrest, excessive force; court found arrest was within deputy's discretionary authority).

Further, plaintiff's arguments based on the officer's involvement in traditional jailer functions is without merit. Though defendants have not identified a written rule or procedure authorizing a police officer for the Town of Butler to be involved in the booking of an arrestee in the County Jail, there is uncontested evidence–principally from the deposition testimony of the jailer, Wallace–that this procedure was commonly used at the Choctaw County Jail and was thus within the practical scope of Lovette's duties. The evidence is clear that detention of the plaintiff, the transportation of the plaintiff to the jail, the activities at the jail, and the arrest and subsequent tasing of the plaintiff were acts of the sort that were within Lovette's job duties. Accordingly, the court finds that both Lovette and Jackson were engaged in actions within their discretionary authority.

Plaintiff asserts claims of excessive use of force under both the Fourth and the Fourteenth Amendments.[9] Defendants Lovette and Jackson have raised the defense of qualified immunity in response. The initial question, which has caused the court some difficulty, is which Amendment applies to plaintiff's situation. See *Baker v. McCollan*, 443 U.S. 137, 140 ("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged.")

In its order (doc 58) addressing the defendants' Motion to Dismiss, the court has previously reached the conclusion that the Fourteenth Amendment was applicable. The court reconsiders that ruling and now finds that the previous ruling was in error.[10] The summary of the facts upon which

---

[9] In the court's order of July 26, 2006 (doc. 58), plaintiff was instructed to dismiss his Fourth Amendment claim and to amend his complaint to add a claim under the Fourteenth Amendment. Plaintiff instead amended to add a claim based on the Fourteenth Amendment but also retained the Fourth Amendment allegations.

[10] Counsel for defendants have raised an issue concerning the court's power to reconsider its prior order dismissing the Fourth Amendment claim. However, a court may alter a prior

the court relied in reaching that prior conclusion was incomplete and misunderstood; the extensive evidentiary submissions on summary judgment have provided a far more detailed and more reliable picture of the arrest.

On its surface, the standard is relatively clear: "all claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted).   However, the Supreme Court acknowledged in *Graham* that it had not answered the question of "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins." *Graham*, 490 U.S. at 395 n.10.  The courts of this Circuit have presumed, in answer to that question, that the seizure of an arrestee ends with the completion of the arrest and that he or she then takes on the status of 'pretrial detainee' which alters the applicable Constitutional protections.  See *Hicks v. Moore*, 422 F.3d 1246, 1254 n.7 (11th Cir. 2005) ("The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until conviction by the Fourteenth Amendment) is not settled in this Circuit.").

However, this case presents an additional issue which also has not been settled in this

_____

ruling and apply a different rule of law if it finds its prior order was clearly erroneous and would work a manifest injustice. *Arizona v. California*, 460 U.S. 605, 619 (1983). Since the court's ruling under the standard of Fed.R.Civ.P. 12(b)(6), the parties have conducted extensive discovery and have submitted the evidence to the court.  In his Response to the Motions for Summary Judgment, plaintiff has sought reconsideration of the court's prior determination that the Fourteenth Amendment applies.  Notwithstanding defendants' assertions that the arrest was completed at the apartments, the deposition testimony of the arresting officer and others has significantly undercut that claim.  Based upon that evidence, the court finds its prior determination to have been clearly erroneous.  It is without serious question that it would be a manifest injustice on summary judgment for the court to apply the wrong constitutional standard to plaintiff's claims.

Circuit. "[T]he line is not always clear as to when an arrest ends and pretrial detainment begins." *Garrett v. Athens-Clarke County, Georgia*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004). Even under standardized police procedures, there is a practical gap, a 'legal twilight zone,' between the completion of the arrest as that term is commonly used and the beginning of pretrial detainment. See *Calhoun v. Thomas*, 360 F.Supp.2d 1264, 1272 (M.D.Ala. 2007). The procedures utilized in this case–in which the seizure began at the apartment complex but the arrest did not occur until after plaintiff had already been booked[11]–are far from standardized.

Other Circuits have taken divergent approaches to the issue. *See e.g. Garrett*, at 1279 n.11 (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998)); *Calhou*n, at 1272 (discussing cases from other jurisdictions). For example, the Fifth Circuit has held "that the Fifth or Fourteenth Amendments begin to protect persons "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." *Gutierrez*, 139 F.3d at 452 (emphasis original; quoting *Valencia v. Wiggins*, 981 F.2d 1440, 1443 (5th Cir. 1983).); *Brothers v. Klevenhagen,* 28 F.3d 452, 456 (5th Cir.1994) (applying Fourteenth Amendment after period defined in *Valencia*). Several other Circuits have analyzed the distinction under a theory defining seizure to extend through the period during which the arrestee remains in the custody of the arresting officers. See e.g. *Fontana v. Haskin,* 262 F.3d 871, 879-880 n. 5 (9th Cir.2001) ("The Fourth Amendment's prohibition against unreasonable search and seizure continues to apply after an arrestee is in the custody of the arresting officers"); *Torres v. McLaughlin*, 163 F.3d 169, 174 (3d

---

[11] At the hearing on the instant motions, defendants Lovette and the Town of Butler strenuously disputed that the arrest took place at that time. Nonetheless, taken in the light most favorable to the plaintiff, the record clearly supports such a finding.

Cir.1998) (Fourth Amendment does not apply to post-trial detainee; holding, in *dicta*, that Fourth Amendment extends past completion of arrest), *cert. denied,* 528 U.S. 1079  (2000); *Cox v. Treadway,* 75 F.3d 230, 235 (6th Cir.) (Applying Fourth Amendment to post-arrest use of force), *cert. denied,* 519 U.S. 821 (1996); *Austin v. Hamilton,* 945 F.2d 1155 (10th Cir.1991) (overruled on other grounds) (applying Fourth Amendment standard to excessive force claim where plaintiffs were detained and beaten for 12 hours without being formally arrested); *Powell v. Gardner,* 891 F.2d 1039, 1044 (2d Cir.1989) ("We think the Fourth Amendment should probably be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer"); *Powell v. Gardner,* 891 F.2d 1039, 1044 (2d Cir.1989) (holding Fourth Amendment protects against use of force while in arresting officer's custody until arraignment or formal charge).

The Fourth Circuit has rejected the "continuing seizure" theory.  See *Riley v. Dorton*, 115 F.3d 1159, 1164 (4th Cir. 1997). The Seventh Circuit has rejected the extension of Fourth Amendment protection into the "gap" between the initial arrest and charge–at least once the person has been arrested and "placed securely in custody."  *Wilkins v. May,* 872 F.2d 190, 192-93 (7th Cir.1989) (Fourteenth Amendment applied to claim for threats during interrogation).

The authority in this Circuit establishes no clear cut-off point beyond which the Fourth Amendment ceases to apply.  In *Redd v. Conway*, 160 Fed.Appx. 858, 861 (11th Cir. 2006), a panel of the Court of Appeals analyzed a claim that officers used excessive force during booking under the Fourteenth Amendment standard, without discussion of the potential for use of the Fourth Amendment standard.  In *Cotrell v. Caldwell*, 85 F.3d 1480 (11th Cir. 1996) a different panel reversed the trial court's application of the Fourteenth Amendment to an excessive force claim in

15

which the arrestee died during transportation to the jail.[12]  And in *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002), another panel analyzed the plaintiff's excessive force claim under the Fourth Amendment where the allegedly excessive force was applied during the ride to the jail but declined to decide whether the Fourth Amendment applied to a pretrial detainee.

At the hearing, the court noted the evidence–principally in the form of deposition testimony from the arresting officer, defendant Lovette–that plaintiff was not arrested until he was already in the jail and the booking process was underway.  Defendants' acknowledged that the record included contrary evidence but asserted that a) the contrary evidence did not create an issue of fact because it could not be reasonably construed to support plaintiff's version of the arrest and b) the record clearly established that Lovette had arrested the plaintiff at the apartment complex.[13]  The court can not accept either assertion.  As set forth above, plaintiff has offered sufficient evidence that a reasonable jury could find that Lovette first arrested plaintiff immediately prior to the tasing. Moreover, at the time of the tasing the plaintiff had not been searched or fingerprinted and the arresting officer continued to command plaintiff.

Based on these facts, the court finds that the tasing occurred incident to the arrest and thus

---

[12]  The Court of Appeals also applied the Fourteenth Amendment to claims it identified as involving "mistreatment in custody."  *Id.*, at 1489-90.

[13]  Counsel pointed to Lovette's deposition testimony at page 27.  "Q: All right. So Mr. Stephens gets in the back seat, and did you place him under arrest? A: Yes, sir."  The statement does not indicate, except by implication, the timing of the arrest in relation to plaintiff's entering the squad car. Beginning on the same page, defendant Lovette appears to clarify his statement, discussing at some length the order of events from picking plaintiff up at the apartments to the events in the booking room of the county jail.

In addition, defendant's counsel argued that the jury could infer, from the fact that Lovette took plaintiff into custody and began the booking process, that he had already been arrested.  Such inferences are not drawn in the movant's favor on summary judgment.

the Fourth Amendment is applicable.[14]   See *Hicks*, 422 F.3d at 1254 n.7 (detailing acts police had

and had not taken, including turnover of custody to jailer and appearance before magistrate, and

determining that–in absence of assertion that strip search and fingerprinting were separate from

arrest–Fourth Amendment applied.); *see also Powell v. Gardner*, 891 F.2d 1039, 104)(2nd Cir.

1989)(Fourth Amendment applies while arrestee is "in the custody (sole or joint) of the arresting

officer"); *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988) (same); *Robins v. Harum*, 773

F.2d 1004, 1010 (9th Cir. 1985) (same).

   The Fourth Amendment safeguards "[t]he right of the people to be secure in their person,

houses, papers and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court determined that the Fourth

Amendment applies to all claims alleging a police officer used excessive force in the course of an

arrest, investigatory stop or other "seizure" of a free citizen.  In that case, the Court stated:

> Where, as here, the excessive force claim arises in the context of an arrest or an
> investigatory stop of a free citizen, it is most properly characterized as one invoking
> the protections of the Fourth Amendment, which guarantees citizens the right 'to be
> secure in their persons ... against unreasonable seizures' of the person.

*Graham v. Connor*, 490 U.S. at 394.

   The Fourth Amendment standard for analyzing an excessive force claim requires a "careful

balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests'

against countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. at 395-96

---

[14] Because the Fourth Amendment is applicable based on plaintiff's facts, the court will
not analyze plaintiff's Fourteenth Amendment excessive force claim.  See *Graham*, 490 U.S. at
395 and note 10 ("Because the Fourth Amendment provides an explicit textual source of
constitutional protection against this sort of physically intrusive governmental conduct, that
Amendment, not the more generalized notion of 'substantive due process' must be the guide for
analyzing these claims.").

(quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  The court must look to see whether the actions of the individual officer are "objectively reasonable" in light of the facts and circumstances confronting the officer at that time.  *Graham v. Connor*, 490 U.S. at 397.  "The 'reasonableness' of a particular use the force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Indeed, "'not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham v. Connor,* 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgment – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at 396-97.  Relying on *Graham*, the Eleventh Circuit cautioned as follows:

> In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.

*Crosby v. Monroe County*, 394 F.3d 1328, 1334 (11th Cir. 2004).

The court must determine whether the amount of force was objectively reasonable, that is, "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Willingham v. Loughnan*, 261 F.3d 1178, 1186 (11th Cir. 2001).  The court must consider several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, at 396.

With regard to the seriousness of the crime at issue, plaintiff was detained at the scene and taken to the jail on a report that he had been attempting to run over senior citizens in his car. However, it is not clear for what crime(s) Stephens was arrested, despite his repeated inquiries during his detention.  The arresting officer, Lovette, testified in his deposition that had not believed that he had enough information to arrest plaintiff on that charge when they were at the apartment, and there is no evidence that any additional information relevant to that charge had come to Lovette's attention prior to his arrest of plaintiff.  Instead, it appears that Lovette arrested Stephens at the jail for his behavior in Lovette's presence in the squad car and at the jail.  After the arrest was completed and Stephens was in his cell, Lovette completed an arrest report and included charges of Disorderly Conduct and Resisting Arrest.  He testified that the charge of resisting arrest had to do with plaintiff's alleged use of keys to fight off the use of force; that action had not happened at the time Lovette allegedly told plaintiff that he was under arrest.[15]  The disorderly conduct which had occurred before that time was limited to being loud and obnoxious.  That vocal misbehavior appears to be the crime at issue that gave rise to the arrest.  Nonetheless, the court bears in mind, as the arresting officer must have done, that plaintiff had been accused of assault with a vehicle, as well. That awareness would reasonably be expected to form a part of the defendants' consideration in deciding how much force to use.  However, the trigger for the use of force appears to have been plaintiff's refusal to put on jail clothes.

Plaintiff did not pose an immediate threat to the safety of the officers or others.  He was unarmed, in the confines of a small room at the jail, surrounded by three police officers.  He had

---

[15] On summary judgment, the court presumes that plaintiff did not have keys in his hand, precluding use of that allegation in 'the calculus of reasonableness.'

made no physically threatening movement, but merely repeated–in an increasingly loud and profane manner–his questions about the basis for his arrest and his objection to putting on jail clothing. However, he clearly was becoming agitated at the time of the arrest and the use of force. Additionally, plaintiff was admittedly intoxicated and defendant Lovette asserts that he had notice of that condition, though he did not believe it sufficiently serious to warrant an arrest for public intoxication.

Moreover, plaintiff was not actively resisting arrest or attempting to flee from the interior room in the jail. Plaintiff was wedged in a corner of the room beside a filing cabinet. His admitted attempts to push the taser away from his body, may reasonably be viewed as a basic reflex. Resisting pain does not necessarily equate with resisting arrest and a reasonable jury could find that defendants Lovette and Jackson could not reasonably have perceived it to be so. Whether analyzed in a 'threat matrix' or simply by a common sense view of reasonableness, only relatively minimal force was reasonable if the situation was as the plaintiff has described.

In *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), the Court held that a "single use of the taser gun causing a one-time shocking" to a "hostile, belligerent, and uncooperative" arrestee in order to effectuate an arrest during a traffic stop was not an excessive use of force under the facts of that case. Like the plaintiff in the instant case, Draper repeatedly refused to comply with an officer's order, became increasingly agitated, and was vocally belligerent. *Id.*, at 1276-77. The crime at issue in *Draper* was a traffic violation. Unlike the present case, the stop was made at the side of the highway and the arresting officer was alone. Draper was pacing and moving about the scene. The officer felt 'threatened.' *Id.*, at 1273. The primary distinctions in the instant case, based on the plaintiff's version of the facts, are that plaintiff was in the custody of three officers, in the jail

20

building, unable to get away or to do any particular harm, and was tasered four times for refusing to change clothes in order to facilitate his incarceration.

In *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002), the Court considered an excessive force claim by an arrestee who testified that she was subjected to nonlethal force–specifically, being sprayed two or three times with pepper spray–while in custody, handcuffed in the back of the police car. She had been arrested at the scene on charges of disorderly conduct and obstruction of justice; these were charges that the Court described as being 'of minor severity.' *Id.*, at 1347-48. She was allegedly under the officer's physical control. She was being loudly vocal but was not a threat to the officer or others. The court held that it was error to have granted qualified immunity to the officer on the excessive force claim because "[t]he peculiar facts of this case are 'so far beyond the hazy border between excessive and acceptable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point.'" *Vinyard*, at 1355 (quoting *Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir.2000)).

The instant case presents an issue closer to *Vinyard* than to *Draper*, in that the plaintiff was under more control of the three officers than the plaintiff in *Draper.* Nonetheless, even if the court were to accept that a single application of the taser would have been appropriate under *Draper*, the issue before the court is the repeated use–at least four separate trigger pulls by Lovette followed by one use by Jackson–of a taser in such an instance. The repeated use of a taser on an unarmed arrestee who had made no effort to escape, no movement that could be deemed an attack or threat to any officer, who was in custody, in the jail, and was surrounded by three officers, would be objectively unreasonable and excessive, particularly where the use of force was over something as minor as being verbally unruly and refusing to don jail garb.

This determination applies with equal force to defendant Jackson, who applied his taser to the plaintiff after defendant Lovette had already repeatedly done so. The plaintiff's facts support a reasonable inference that Jackson simply 'piled on' with full knowledge of the facts as stated above.

Since the Supreme Court decided *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "the salient question ... is whether the state of the law gave [the official] fair warning [the] alleged treatment of [the plaintiff] was unconstitutional." As noted above, the state of the law at the time of the incident at issue gave defendants Lovette and Jackson fair warning that the repeated use of tasers on a non-violent arrestee in circumstances similar to those presented in this case was excessive. See *Davis v. Williams,* 451 F.3d 759, 767 (11th Cir.2006) ("It is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment.").

Accordingly, the court finds that summary judgment in favor of defendants Jackson and Lovette on the affirmative defense of qualified immunity is inappropriate on the record before the court.

### D.  Municipal liability

Plaintiff has made a claim under §1983 against the Town of Butler for an unspecified unconstitutional policy, practice or procedure, and for deliberate indifference in failing to train or supervise Officer Lovette. Plaintiff appears to argue in his response that the unconstitutional policy was the failure to adequately train the police officers of Butler in the proper use of force.

Under Section 1983, there is no respondeat superior liability. Thus, a municipality may not be sued under Section 1983 for the acts of others but, rather, only for its own acts. *See Monell v. Dept. of Social Serv*., 436 U.S. 658, 691-94 (1978). In order to state a claim under Section 1983

against the Town of Butler, the plaintiff must show that he suffered a constitutional injury, and that

his injury was caused by "a policy, statement, ordinance, regulation, or decision officially adopted

and promulgated by that body's officers." *Monell,* 436 U.S. at 690.

As succinctly explained recently by the Eleventh Circuit,

> Municipal liability may be "based on a claim of inadequate training where
> a municipality's failure to train its employees in a relevant respect evidences a
> deliberate indifference to the rights of its inhabitants such that the failure to train
> can be properly thought of as a city policy or custom that is actionable under §
> 1983." *Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489-90 (11th Cir.1997)
> (quotations omitted). A "policy" is an officially adopted decision of the
> municipality, or a decision of a municipal officer of such a rank that he may be
> said to be acting on the municipality's behalf. *Id.* at 489. "A custom is a practice
> that is so settled and permanent that it takes on the force of law." *Id.* Deliberate
> indifference is exhibited when a "municipality knew of a need to train and/or
> supervise in a particular area and the municipality made a deliberate choice not to
> take any action." *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir.1998).
> Unless a plaintiff shows that the municipality had notice of the need to train, the
> plaintiff has not shown deliberate indifference. *Id.* at 1351.

*Albra v. City of Fort Lauderdale,* 2007 WL 1213230, *4 (11th Cir. 2007).  Moreover, the

governmental custom or policy involved must be the "moving force" behind the alleged

constitutional violation and *respondeat superior* is not an appropriate vehicle to hold a

municipality liable. *See Monell*, 436 U.S. at 691, 694.

The plaintiff has not disputed the defendant's evidence that the Town of Butler's police

department had written policies and procedures that addressed the use of force and specifically

the use of tasers.  These policies require a written report when use of force is applied.  Nor does

plaintiff dispute that both Officer Lovette and Jackson had completed the law enforcement

training required by the State of Alabama, that both officers had received training in the use of

Tasers, that neither officer had prior complaints lodged against them, and that Officer Lovette

had never fired his taser at a subject prior to this incident.  Rather the plaintiff attempts to establish that the Town of Butler had inadequate police training by relying on events that occurred after the incident.  Specifically, plaintiff points to what he deems to be an inadequate investigation by the Chief of Police to establish municipal liability for the incident.  At the hearing on summary judgment, plaintiff's counsel relied on *Vineyard v. County of Murray, Georgia,* 990 F.2d 1207 (11th Cir. 1993) to support this proposition and argued that the decision provides that the absence of an independent investigation of the incident can function as proof of a municipal policy and can satisfy the causation requirement.  Plaintiff's argument is without merit as it applies to the facts of this case.

A panel of the Eleventh Circuit distinguished *Vineyard* in *Gold v. City of Miami*, 151 F.3d 1346, 1353 (11th Cir. 1998) on grounds applicable to the instant case.  As here, and unlike *Vineyard*, the Plaintiff in *Gold* failed to demonstrate that the Miami Police Department historically had not established policies and procedures, had not required officers to file arrest reports when beatings or confrontations occurred, had not logged complaints, and had not investigated complaints.[16]  In the absence of such evidence, *Vineyard* is inapplicable to the present case.

In response to a properly supported summary judgment motion, a nonmovant must come forward with evidence sufficient to establish any challenged elements of each of his claims. *Celotex*, 477 U.S. at  317.   Plaintiff has failed to offer sufficient evidence to allow a reasonable jury to find in his favor on the federal claims against the Town.  Plaintiff has offered no evidence

_____

[16] In this case it is not disputed that the complaint was investigated by the Alabama Bureau of Investigation

that defendant Lovette or Jackson have ever misused their taser on previous occasions or have

ever before been accused of, let alone been guilty of, use of excessive force.  Nor has plaintiff

offered any evidence that the Town had notice of any such widespread behavior from other

officers.  Indeed, the record demonstrates that the Police Department trained its officers in the

use of tasers and had written guidelines for their use.

**E.  State Law Claims**

1. Assault and Battery Claim against Officer Lovette

Plaintiff brings a state-law assault and battery claim against Lovette and seeks to hold the

Town of Butler vicariously liable.  Defendant Butler interposes discretionary function immunity,

also known as state-agent immunity, as an affirmative defense.  He alternatively raises peace

officer immunity pursuant to Alabama Code §6-5-338.

> "Assault" has been defined as an intentional, unlawful, offer to touch the person
> of another in a rude or angry manner under such circumstances as to create in
> the mind of the party alleging the assault a well-founded fear of an imminent battery,
> coupled with the apparent present ability to effectuate the attempt, if not
> prevented.  In a civil case, the elements of battery are: (1) that the defendant
> touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3)
> that the touching was conducted in a harmful or offensive manner.
> Our supreme court has explained that a battery consists in an injury actually
> done to the person of another in an angry or revengeful or rude or insolent
> manner, as by spitting in the face, or in any way touching him in anger, or
> violently jostling him out of the way, or in doing any intentional violence to the
> person of another.

*Wood v. Cowart Enters., Inc.,* 809 So.2d 835, 837 (Ala.Civ.App.2001) (emphasis, internal

quotations and citations omitted).  It is agreed by the parties that defendant Lovette intentionally

applied a taser to the plaintiff, and it is not challenged that the touching was both harmful and

offensive.

Defendants first invoke a statutory immunity (otherwise known as "peace-officer

25

immunity"), which extends State-agent immunity to municipal officers and to the municipalities that employ them. Ala.Code § 6-5-338(a) (1975, enacted 1994). Alabama law on state-agent immunity provides that "[a] State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's ... exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." *Ex parte Cranman,* 792 So.2d 392, 405 (Ala.2000). There is an exception to immunity "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id*.; *Magee v. City of Daphne*, 2006 WL 3791971 (S.D.Ala.). Plaintiff bears the burden of establishing this exception. *See Howard v. City of Atmore,* 887 So.2d 201, 205 (Ala. 2003).[17]

Plaintiff alleges that Officer Lovette's use of force was "beyond the discretion permitted by his office" and was "so egregious as to amount to willful or malicious conduct or conduct engaged in [in] bad faith." (Doc. 59 at 10). As noted above in relation to Lovette's qualified immunity claim, the court finds that Officer Lovette was clearly acting within his discretionary

---

[17]Defendant Lovette raises both discretionary function immunity and statutory peace officer immunity.

>To determine whether a public official is entitled to discretionary function immunity, the court applies a two-prong test. First, the defendant officer must prove that the 'plaintiff's claims arise from the defendant's performance of a discretionary function.' *Id.* at 689. Once the defendant officer satisfies this first prong, 'the burden then shifts to the plaintiff to establish that the defendant acted in bad faith or with malice or willfulness, in order to deny the defendant discretionary immunity from suit.' *Id.*

*Hollis v. City of Brighton*, 950 So.2d 300 (Ala.,2006) (quoting *Ex parte Davis,* 721 So.2d 68 (Ala.1998). Given the similarities between the two doctrines, particularly in light of *Cranman*, it appears that the plaintiff's offer of evidence is sufficient to satisfy the exceptions of both types of immunity.

authority as a peace officer. However, as discussed above at length, the evidence taken in the light most favorable to the plaintiff supports a finding that Lovette applied significantly more force than was arguably warranted by the circumstances, causing plaintiff significant injury. A reasonable jury could thus find that Officer Lovette committed the battery of plaintiff wilfully or maliciously. Accordingly, the court finds that Officer Lovette is not entitled to summary judgment on plaintiff's claim of assault and battery on the basis of state-law immunity.

### 2.   Assault and Battery Claim against Municipality

Plaintiff also states a claim against the Town of Butler for assault and battery by its agent, Officer Lovette. A municipality, under Alabama law, may only be held liable for injuries caused by the negligence of its agents or employees.

The Code of Alabama §11-47-190 (1975) provides as follows:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefore and while acting in the line of his or her duty…

As explained *supra*, with regard to the plaintiff's assault and battery claim, the plaintiff can only proceed against Officer Lovette if he demonstrates that Lovette acted willfully or maliciously. However, if the jury believes that, the Town of Butler could not be held liable for Lovette's actions because municipalities are not liable for intentional acts of their agents. See *Hilliard v. City of Huntsville,* 585 So.2d 889 (Ala.1991) (stating that these terms do not, given their plain meaning, encompass a claim based on wanton conduct); *Scott v. City of Mountain Brook*, 602 So.2d 893 (Ala.1992)(does not apply to intentional conduct); *Todd v. Kelley*, 783 So.2d 31 (Ala.Civ.App.2000), rehearing denied, certiorari denied (Police officer's allegations, in wrongful

discharge claim, that city officials acted maliciously, willfully, and wantonly in terminating him were allegations of intentional acts and did not support a negligence theory, as was required to recover against city for the neglect, carelessness, or unskillfulness of its agents.)

Plaintiff argues in his response that the Town of Butler is not immune under §11-47-90 if Lovette's assault and battery was due to Lovette's neglect, carelessness and unskillfulness. However, municipal liability under Section 11-47-190 is based on the doctrine of *respondeat superior*. *Ott v. City of Mobile*, 169 F.Supp.2d 1301, 1314 (S.D. Ala. 2001). Thus, "[f]or the employer to be liable under that doctrine, the employee must first be a liable for a tort." *Id.* "If the agent is not liable for any tort, the principal is also absolved." *Id.* (<u>citing</u> *Latham v. Redding*, 628 So.2d 490, 495 (Ala. 1993)). Accordingly, since Lovette is immune under §6-5-338 for negligent acts surrounding the arrest of plaintiff, the Town of Butler cannot be held liable for these acts.

### 3. Wanton Supervision, Hiring and Retention

As to the allegation of wanton supervision, hiring and retention, the defendant argues that under Alabama law a municipality cannot be held liable for wanton conduct of its employees. The plaintiff claims that the Town of Butler is liable for wanton supervision, hiring and retention of Officer Lovette. While the claim is cast as acts of the Town of Butler, these specific alleged acts could only be committed by an agent of the Town of Butler. As explained *supra*, a municipality is not liable for wanton acts of its employees. *Hilliard v. City of Huntsville*, 585 So.2d 889 (Ala. 1991).

### 4. Negligent Hiring and Supervision[18]

The defendant challenges plaintiff's claim of negligent hiring and supervision by arguing that there is no evidence that the Town of Butler was aware of any incompetence by Lovette nor is there any evidence that other complaints had been made against Officer Lovette in the thirty years he has worked for the Butler Police Department.   Plaintiff responds, summarily, that the facts that support his federal claim of municipal liability also support this claim.  The court presumes that the plaintiff is relying on his assertion that the investigation by the Town of Butler after the incident was inadequate.  Assuming this is the case, these facts do not support the plaintiff's claim of negligent supervision and hiring of Lovette.  Thus, plaintiff has failed to meet his burden to withstand summary judgment on this claim.

### IV.  Conclusion

For the reasons set forth above, it is hereby **ORDERED**

1) that defendant Jackson's Motion to Strike (doc. 111) is **MOOT**;

2) that defendant Jackson's Motion for Summary Judgment (doc. 95) is **DENIED**;

3) that the Motion for Summary Judgment (doc. 90) filed by defendants Lovette is **DENIED;**

4) that the Motion for Summary Judgment by the Town of Butler (doc. 90) is **GRANTED**.[19]

**DONE** this the 23rd day of June, 2007.

 s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[18] The defendant does not address plaintiff's claim that the Town of Butler is liable for the negligent retention of Lovette after the tasing incident.  Accordingly, the court makes no determination of this claim.

[19] The only remaining claim against the Town of Butler is plaintiff's claim that the Town of Butler negligently retained Lovette after the tasing incident.